TRINA A. HIGGINS, United States Attorney (7349)
TRAVIS K. ELDER, Assistant United States Attorney (11987)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111-2176
(801) 524-5682
travis.elder@usdoj.gov

UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>$121,507 IN U.S. CURRENCY, and 2023 FORD MAVERICK PICKUP TRUCK, VIN NUMBER 3FTTW8E3XPRA69544,<br><br>Defendants *in rem*. | **VERIFIED COMPLAINT FOR FORFEITURE IN REM**<br><br>Case No. 2:24-cv-00752<br><br>Judge |

Pursuant to Supplemental Rule G(2) of the Federal Rules of Civil Procedure, the United States of America alleges this *in rem* complaint for forfeiture against $121,507 in U.S. Currency and 2023 Ford Maverick Pickup Truck Vin Number 3FTTW8E3XPRA69544 ("Defendant Property"):

## NATURE OF THE ACTION

1. This is a forfeiture action under 21 U.S.C. § 881(a)(6). The United States seeks the forfeiture of the defendants in rem because such property is moneys furnished by any person

in exchange for a controlled substance, proceeds traceable to such an exchange, and/or property intended to facilitate such an exchange in violation of 21 U.S.C. §§ 841(a) and/or 846.

## JURISDICTION AND VENUE

2. This Court has subject-matter jurisdiction over this matter under 28 U.S.C. §§ 1345 and 1335(a), and in rem jurisdiction is proper under 28 U.S.C. § 1355(b).

3. Venue in this Court is proper under 28 U.S.C. §§ 1355(b)(1)(A) and 1391(b) because acts giving rise to the forfeiture or a substantial part of the events or omissions giving rise to the claim occurred in the District of Utah, and under 28 U.S.C. § 1395(b) because the Defendant Property was seized in the District of Utah.

## PARTIES

4. The Plaintiff is the United States of America.

5. The Defendant Property includes:

a. $121,507 in United States currency, and a

b. 2023 Ford Maverick Pickup Truck with vin number 3FTTW8E3XPRA69544 (Ford Maverick).

6. The Defendant Property was originally found at Jill Kemple's residence located in Midvale, Utah, on May 14, 2024. The United States anticipates that state court jurisdiction over the Defendant Property will be terminated shortly when authorities for the State of Utah return the Defendant Property to Jill Kemple. The United States will be moving the court for a warrant of arrest in rem to seize the Defendant Property from Jill Kemple for forfeiture in this case.

7. A valid Utah driver's license for Jill Kemple at the time of the Defendant Property's seizure showed she was born in 1962 and had an address at her residence in Midvale, Utah.

## FACTS

8. The Controlled Substances Act (CSA) places all substances which are in some manner regulated under federal law into one of five schedules. This placement is based upon the substances' medical use, potential for abuse, and safety or dependence liability. Drugs on Schedules I and II of the CSA have a high potential for abuse.

9. Schedule I controlled substances include the substances Alpha PHP/PVP, PHP, and other synthetic cathinones commonly known as "bath salts." Other Schedule I controlled substances include marijuana.

10. Schedule II controlled substances include methamphetamine and cocaine.

11. In the United States, only those authorized by the Drug Enforcement Administration (DEA) can distribute controlled substances. The DEA has not authorized Jill Kemple to distribute any controlled substances.

12. The United States and a law enforcement agency of the State of Utah have created a taskforce to investigate drug trafficking crimes including the distribution of controlled substances and the property obtained from or used in such trafficking. This taskforce includes the DEA, Homeland Security Investigations (HSI), and the Utah State Bureau of Investigations (SBI).

**Initial Investigation of Jeremy Kemple and Jill Kemple**

13. In May 2016, United States Customs and Border Protection (CBP) officers inspected a parcel shipped from China to Jeremy K. Kemple in Salt Lake City. The parcel contained approximately 46 pounds of GHB (Butanediol), a Schedule I controlled substance.

14. In March 2019, CBP officers inspected a letter shipped from the Netherlands to Jeremy Kemple in Salt Lake City. The parcel contained approximately 14 grams of Alpha PHP.

15. In May 2019, CBP officers inspected a letter declared as "documents" and shipped from the Netherlands to Jill Kemple at an apartment on West Temple. The parcel contained approximately 14.09 grams of a powder that tested positive for Alpha PHP. A record check confirmed that at the time of the parcel's inspection, Jill Kemple resided at the apartment on West Temple.

16. In early November 2022, a source of information (SOI) provided agents information regarding Kevin Jeremy Kemple (Jeremy Kemple) and Jill Kemple. The SOI indicated that both Jeremy Kemple and Jill Kemple were involved in the distribution of Alpha PHP.

17. In late November 2022, HSI executed a search warrant at the residence of Jacob Macfarlane (Macfarlane) related to his involvement with the importation and distribution of Alpha PHP. Agents also interviewed Macfarlane.

18. During the interview, Macfarlane stated:

a. He previously lived with Jeremy Kemple for several months;

b. Jeremy Kemple is the son of Jill Kemple;

c. Jill Kemple moved from Rose Park and was living with Jeremy Kemple at the time of the interview;

d. Jeremy Kemple had his orders of Alpha PHP shipped to California because Homeland Security seized too many packages shipped to Utah;

e. Jill Kemple drove to California and returned with approximately 500 grams of Alpha PHP each trip; and

f. Jeremy Kemple sold Alpha PHP directly out of his residence in Salt Lake City, Utah,, to a small circle of buyers.

19. In June of 2023, agents observed a confidential informant (CI) give money to S.T. for bath salts. S.T. told the CI his source for the bath salts was Jeremy Kemple. Agents observed S.T. driver to Jeremy Kemple's residence, park in the driveway, and after 15 minutes return to the CI with a small plastic bag containing approximately 10 grams of bath salts.

20. In September of 2023, a SOI informed HSI agents that Jill Kemple distributed both bath salts and GHB with Jeremy Kemple.

21. In April 2024, a CI told HSI agents that Jill Kemple was distributing large quantities of Alpha PHP/PVP (bath salts). The CI indicated that Jill Kemple no longer lived with her son, but instead lived in Midvale, Utah.

22. In late April 2024, a SOI informed HSI agents:

a. Jill Kemple lived in Midvale and drove an orange pickup truck;

b. Jill Kemple was ordering and distributing approximately 700 grams of bath salts monthly; and

c. Jeremy Kemple was purchasing bath salts from his mother for $250 a gram and selling them for $400 a gram.

23. On April 25, 2024, HSI agents conducted a record check and determined that the Ford Maverick was registered to Jill Kemple. On that same date, agents observed the Ford Maverick at Jill Kemple's residence in Midvale. Registration records showed that Jill Kemple registered the Ford Maverick at her son's address in Salt Lake City, Utah.

**Discovery of the Defendant Property at Jill Kemple's Residence in Midvale, Utah**

24. On May 14, 2024, Judge Augustus G. Chin of the Third District Court for Salt Lake County, Utah authorized a search warrant to search Jill Kemple's residence. The authorization was based on probable cause to believe that contraband and proceeds from and instrumentalities and means for distributing Alpha PHP/PVP were located at the home for the purpose of committing or concealing the commission of an offense in violation of Utah State Code 58-37-8 (distribution of controlled substances).

25. On May 14, 2024, agents with HSI and SBI executed the search warrant at Jill Kemple's residence in Midvale, Utah.

26. Jill Kemple was the sole resident of the residence in Midvale, Utah.

27. During the execution of the search warrant, investigators found 147 grams of methamphetamine, 10 grams of cocaine, 334 grams of marijuana, and three grams of Alpha PVP, and most of the $121,507 in rolled and rubber-banded bulk cash together in a safe within the residence. Investigators also discovered one gram of Alpha PVP in Jill Kemple's purse. Additionally, investigators found items indicative of the distribution of narcotics inside Jill

Kemple's residence, including five digital scales, hundreds of baggies of different sizes, and rubber bands.

28. The denominations of the $121,507 included: 708 $1s, 117 $2s, 209 $5s, 143 $10s, 3262 $20s, 181 $50s, and 438 $100s. In the investigators' experience, those involved in drug trafficking traffic in narcotics using cash, need large volumes of cash to facilitate their trafficking, and frequently rubber-band cash in the same manner as the $121,507 was rubber-banded.

29. During the execution of the search warrant, agents reviewed some of the contents on Jill Kemple's cellular telephone. HSI investigators observed numerous text messages on her cellular telephone discussing the distribution of baths salts (Alpha PVP/PHP).

**First Interview of Jill Kemple**

30. During the execution of the search warrant on May 14, 2024, HSI Special Agent David Cole and SBI Agent Ronny Corona interviewed Jill Kemple in Special Agent Cole's vehicle parked in Jill Kemple's driveway. They advised Jill Kemple of her Miranda rights, which she waived and agreed to speak with investigators. Jill Kemple admitted that she had marijuana, methamphetamine, and approximately $90,000 cash inside the safe in her residence.

31. Jill Kemple initially claimed she inherited the cash in her safe when her mother passed away approximately a year earlier. Jill Kemple claimed initially that she received the inheritance in cash because she did not want it to interfere with her social security payments. Jill Kemple then changed her story and said she received the inheritance in the form of a check deposited into her Mountain America Credit Union account, which she withdrew in cash to keep at her residence.

32. As agents asked about the different expenses to include her purchase of the Ford Maverick, Jill Kemple changed the amount of money she received. She said she purchased the Ford Maverick for $31,000 in 2023. For the purchase, she used a cashier's check that she purchased with cash. Jill Kemple said she received approximately $2,200 per month from Social Security and these funds covered her monthly expenses.

33. Regarding the narcotics, Kemple admitted the following:

a. She obtained the marijuana from "Jill and Teddy;"

b. Teddy was also involved with bath salts;

c. She trades Teddy bath salts for marijuana;

d. A.M. supplies her with the methamphetamine that she sells;

e. She purchased some bath salts from "Mark" in Grantsville, Utah, for $275 a gram, which she sold for approximately $300 a gram;

f. She ultimately admitted she knew Mark's last name and that she did two orders of bath salts from Mark, which he brought to her;

g. The details Jill Kemple provided during her interview related to narcotics distribution changed multiple times;

h. She sold most of her bath salts to A.A., a person that agents have known to be a distributor of baths salts;

i. She sold bath salts to A.M. and to Teddy; and

j. She denied provided bath salts to Jeremy Kemple to sell.

34. Jill Kemple claimed to have sold only a total of 225 grams of bath salts, which at $300 per gram would have totaled $67,500.

**Second Interview of Jill Kemple**

35. On May 16, 2023, HSI investigators returned to Jill Kemple's residence to speak with her.

36. She told investigators numerous conflicting statements again that differed from the statements she made on May 14, 2024.

37. Jill Kemple said the only reason she decided to become a drug dealer and sell bath salts was because she wanted to be a better grandmother to her grandchildren.

38. Jill Kemple changed her previous statements made on May 14, 2024, regarding the money found in her safe and her inheritance. She claimed that she received $108,000 in insurance money as a deposit in her bank account after her mother passed away over two years earlier.

39. Jill Kemple admitted her bank records would not reflect her withdrawing more than a little bit of the money on a few occasions.

**Third Interview of Jill Kemple**

40. On June 3, 2024, HSI investigators returned to Jill Kemple's residence to return some seized items. Jill Kemple waived her Miranda rights and agreed to speak with the investigators. During this interview Jill Kemple stated:

a. She purchased multiple orders of bath salts from Mark including in quantities of 50 grams, 250 grams, and 500-gram orders;

b. A portion of each of those orders belonged to her;

c. She sold all the bath salts including Mark's portion;

d. She frequently met up with Mark to receive the parcels of bath salts and to give Mark his portion of the proceeds from the bath salt orders; and

e. She owes Mark $30,000 in bath salt proceeds and could not pay Mark what he was owed because investigators had seized all her money.

**Financial Investigation**

41. HSI investigators obtained information from the Utah State Department of Workforce Services (DWFS) on Jill Kemple. DWFS possesses information on wages received from employers in the State of Utah. According to DWFS information, Jill Kemple has not received any wages from employers in the State of Utah since 2009.

42. HSI investigators obtained the purchase documents for the Ford Maverick from Ken Garff West Valley Ford. The purchase documents state the Ford Maverick was purchased on or about August 17, 2023, for approximately $32,541 (includes fees). Jill Kemple paid for the Ford Maverick in full with cashier's check 9943515 totaling approximately $32,541 from Mountain America Credit Union (MACU). On Jill Kemple's "Application Statement" to purchase the Ford Maverick she listed her current employer and her occupation as "Disability" and her gross monthly salary as $2,400 (calculated annual salary $28,800). In addition, she listed "12 Yrs." for "Time on Job" (Disability).

43. Investigators obtained bank record from MACU. These records indicate that on August 17, 2023, Jill Kemple purchased a cashier's check with $25,500 in cash. Investigators believe this check is cashier's check 9943515 that was used to purchase the Ford Maverick.

44. Investigators obtained additional financial information on Jill Kemple from casinos in Wendover, Nevada. This information indicates that Jill Kemple deposited the

following cash amounts totaling $55,721 into gaming devices at the casinos: September 7, 2022: $10,507; October 7, 2022: $10,026; March 12, 2024: $14,131; and May 15, 2024: $21,057. The casino financial information does not state how much Jill Kemple withdrew, but if she had cashed out more than $10,000 that would have generated a report. The casino financial information does not contain any such report.

45. Based on the above financial information, from approximately September 7, 2022, through May 15, 2024, Jill Kemple deposited, spent, and possessed approximately $202,728. This time period encompasses the Ford Maverick's purchase on or about August 17, 2023. During the same time period, DWFS reported $0 wages earned by Jill Kemple and she only earned approximately $50,400 (21 months times $2,400) from "Disability" based on her stated income from the "Application Statement" when she purchased the Ford Maverick.

## FIRST CAUSE OF ACTION
21 U.S.C. § 881(a)(6)
(forfeiture of property related to drug trafficking)

46. The United States reasserts all allegations previously made.

47. Under 21 U.S.C. § 881(a)(6), "moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of" 21 U.S.C. § 801 et seq. are subject to forfeiture.

48. Under 21 U.S.C. § 841(a), it is "unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture,

distribute, or dispense, a controlled substance." An attempt or conspiracy to do the same is also prohibited by 21 U.S.C. § 846.

49. As set forth above, the Defendant Property is moneys furnished by any person in exchange for a controlled substance, proceeds traceable to such an exchange, and/or property intended to facilitate such an exchange in violation of 21 U.S.C. §§ 841(a) and/or 846. The Defendant Property is therefore subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).

## REQUEST FOR RELIEF

WHEREFORE, the United States respectfully asserts that the Defendant Property is subject to forfeiture by the United States under 21 U.S.C. § 881(a)(6) and 18 U.S.C. § 981(a)(1)(C).

The United States further requests:

A. That, upon motion of the United States, the Court issue a Summons and Warrant of Arrest *in Rem* that authorizes federal authorities to seize the Defendant Property.

B. That Notice of this action be given to all persons known or thought to have an interest in or right against Defendant Property;

C. That a Judgment of Forfeiture be decreed against Defendant Property;

D. That upon the issuance of a Judgment of Forfeiture, the United States Treasury Department, Customs and Border Protection, and/or Department of Homeland Security, or their delegate dispose of Defendant Property according to law; and

E. That the United States receive its costs of court and all further relief to which it is entitled.

Dated this 7th day of October, 2024.

TRINA A. HIGGINS
United States Attorney

*/s/ Travis K. Elder*___________
TRAVIS K. ELDER
Assistant U.S. Attorney

**VERIFICATION**

I am a Special Agent with the Department of Homeland Security, Homeland Security Investigations (HSI). As a Special Agent with the HSI, my duties and responsibilities include participating in the investigation and prosecution of persons who violate federal laws and the forfeiture of property obtained or used in those crimes.

I have read the contents of the foregoing Verified Complaint for Forfeiture *In Rem* and verify under penalty of perjury pursuant to 28 U.S.C. § 1746 that the statements contained therein are true and correct to the best of my knowledge and belief.

Executed on this 7th day of October, 2023.

David Cole Special Agent
DAVID COLE, Special Agent
Department of Homeland Security